IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM BLAKE,                          *

          Plaintiff             *

v.                                      * Civil Action
                                        L07-CV-50

BALTIMORE COUNTY, MARYLAND, et al.,   *

          Defendants            *

               *    *    *    *    *    *    *

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Plaintiff William Blake, by and through counsel, Kathleen Cahill, hereby moves for summary judgment on his Motion for Preliminary Injunction.

Plaintiff claims past and imminent acts by his employer, defendant Baltimore County Police Department ("the Police Department"), violate the Americans with Disabilities Act ("the ADA"). At this stage of the proceedings, plaintiff challenges a December 14, 2006 order issued by defendant Chief of Police Sheridan that he submit to compelled medical testing, specifically an electroencephalogram or EEG. Plaintiff claims that that test, if conducted, and the requirement of compliance with future orders compelling medical disclosure or testing as a condition of continued employment, constitutes violations of the ADA.

1

The December 14, 2006 order violates the ADA, plaintiff asserts, because the impending EEG is illegitimate and retaliatory, as was a September 1, 2006 order compelling a fitness-for-duty examination, the accompanying review of his medical records, and any such future compelled medical inquiries and testing. Plaintiff also claims those acts violate his due process and privacy rights. However, given the strength and clarity of his rights under the ADA in these circumstances, plaintiff relies exclusively upon his ADA claims for purposes of this summary judgment motion.

MOTION FOR SUMMARY JUDGMENT STANDARD

There is no genuine issue as to material fact and plaintiff is entitled to judgment as a matter of law. F.R.Civ.P. 56. Specifically, the case is ripe for resolution of the request for preliminary injunction, and under the applicable test, plaintiff is entitled to the issuance of a preliminary injunction barring further medical inquiry, testing or compelled medical disclosure.

MATERIAL FACTS NOT IN DISPUTE

1.   Plaintiff has been a member of the Baltimore County Police Department since 1987. He has served as a detective on the Criminal Intelligence Team since June 1999. Affidavit of Officer William Blake, ¶2.

2.   On April 24, 1996, plaintiff suffered a potential seizure on the job in the precinct. Affidavit of Officer William Blake, ¶3; Deposition of Officer William Blake (6/5/07), p.3-4; Deposition of Howard Moses M.D. (8/8/07), pp. 18, 23, 27, 37; Deposition of Alan Krumholz M.D. (8/9/07), p.4-6.

3.   Plaintiff was taken by ambulance to GBMC, and accompanied by two superiors to the hospital. Affidavit of Officer William Blake, ¶4; Deposition of Officer William Blake, p.5-8.

4.   Plaintiff was treated in GBMC's emergency room and released. Affidavit of Officer William Blake, ¶5; Deposition of Officer William Blake, p.8.

5.   Plaintiff was treated in follow-up by neurologist Howard Moses, M.D. Plaintiff was released to return to work by Dr. Moses effective May 10, 1996. Affidavit of Officer William Blake, ¶6; Deposition of Officer William Blake, p. 12-17; Deposition of Howard Moses M.D., p. 40-42.

6.   Plaintiff submitted the required paperwork and was approved by the Police Department to return to duty effective May 10, 1996. Affidavit of Officer William Blake, ¶7 & Exh. A; Deposition of Officer William Blake, p.13-17.

7.   Since then, plaintiff has not suffered any other potential seizures, nor has he required additional

treatment or any medication as a result of the April 24, 1996 medical event. Affidavit of Officer William Blake, ¶8; Deposition of Officer William Blake, pp.11, 64, 107.

8.   From April 1996 to the present, plaintiff has performed his duties exceptionally and with distinction. He has been nominated as Officer of the Year and received countless commendations. Affidavit of Officer William Blake, ¶9 and Exh. B; Deposition of Officer William Blake, p.48

*   *   *   *

9.   In the summer of 2006, plaintiff learned that a fellow police officer, Philip Crumbacker, had experienced a seizure, and that as a result he was being forced off the job by the Police Department. Affidavit of Officer William Blake, ¶10; Deposition of Officer William Blake, p.49-51.

10.  Plaintiff sought out Officer Crumbacker to offer his support and assistance, and to share that he too had suffered a seizure on the job and that he had fully performed his duties since then without limitation or challenge from the Police Department. Affidavit of Officer William Blake, ¶10; Deposition of Officer William Blake, p.49-51.

11.  On August 31, 2006, a hearing convened on Officer Crumbacker's challenge to his forced retirement from the

Police Department. Plaintiff was called as a witness by
Officer Crumbacker and testified under oath, pursuant to a
subpoena, that he had suffered a potential seizure on the
job in 1996 and that he had fully performed his duties
since then without limitation, problems or challenge from
the Police Department. Affidavit of Officer William Blake,
¶11 & Exh. C; Deposition of Officer William Blake, p.48.

12.  Immediately following the hearing, the Chief of
Police, Terrence Sheridan, was advised of plaintiff's
testimony. Chief Sheridan convened an urgent meeting and
decided that plaintiff, along with one other police officer
who had testified at the hearing for Officer Crumbacker and
a third officer whose name was raised in evidence by
Officer Crumbacker's lawyer, must submit to compelled
fitness-for-duty examinations. Deposition of Chief Terrence
Sheridan (7/11/07 & 9/25/07), pp.61, 70, 75.

13.  One day later, on September 1, 2006, the official
order was issued that plaintiff submit to a fitness-for-
duty examination on September 5, 2006. Affidavit of Officer
William Blake, ¶12 and Exh. D.

14.  From May 10, 1996, the date of his return to work,
until September 1, 2006, the date of the notification of
the compelled fitness-for-duty examination, plaintiff had
never heard another word from the Police Department about

the 1996 medical event. Affidavit of Officer William Blake,
¶13; Deposition of Officer William Blake, pp.66-68, 109.

15.  By September 1 of 2006, plaintiff had taken only one
sick day that entire year. Affidavit of Officer William
Blake, ¶14 and Exh. E.

16.  On September 5, 2006 plaintiff submitted to the
fitness-for-duty examination. He did so only because he
feared for his job if he were to disobey an order of the
Chief of Police. He complied under protest and upon written
notice that he viewed the examination as a violation of his
rights. Affidavit of Officer William Blake, ¶15, and Exh.
F.

17.  Plaintiff was examined by Peter Oroszlan, M.D., a
doctor defendants use frequently to conduct compelled
medical exams. In 2006, Dr. Oroszlan was paid in excess of
$60,000.00 by defendants for such services and opinions.
Deposition of Peter Oroszlan, M.D., (7/26/07), p. 14-15.

18.  In October 2006, Dr. Oroszlan issued his Report
concluding that plaintiff *was* fit-for-duty. Nevertheless,
Dr. Oroszlan added: "I believe it is reasonable to request
that Mr. Blake at least undergo a random
electroencephalogram even if the yield is expected to be
low." Deposition of Peter Oroszlan, M.D., p. 4, Exh. 2;
Affidavit of Officer William Blake, ¶16, Exh. G.

19.  On December 14, 2006, the Chief of Police ordered
plaintiff to submit to a compelled EEG. Affidavit of
Officer William Blake, ¶17 and Exh. H.

20.  In response, plaintiff initiated legal action to
enjoin defendants from compelling him to submit to the EEG
and from taking any adverse employment action against him
for refusing to submit to the test.

*     *     *     *

21.  Dr. Moses, plaintiff's treating neurologist and a
highly renowned Johns Hopkins neurologist, Deposition of
Peter Oroszlan, M.D.,(7/26/07), p. 78-79, see also Amended
Complaint, Exh. 8, testified in his deposition that he is
of the opinion that an EEG performed in 2007 would only add
confusion about plaintiff's current medical status.
Deposition of Howard Moses M.D., pp. 10-11, 45, 47.

22.  Dr. Moses is of the opinion that having an EEG
performed in 2007 could actually cause plaintiff to suffer
a seizure even if he does not have an underlying seizure
disorder, as that is an inherent risk of undergoing an EEG
procedure. Deposition of Howard Moses M.D., p. 45-46.

23.  Dr. Moses is of the opinion that it is "highly
unlikely" plaintiff will have a seizure in the future,
"less than 5%, less than 1 or 2%," and that that risk will

decline the longer plaintiff goes without having a seizure.
Deposition of Howard Moses M.D., pp. 22, 23, 34.

24.  Dr. Moses is of the opinion that it is never
appropriate or consistent with the standard of care to
order a patient to undergo an EEG without current clinical
findings indicating the need for that test. Deposition of
Howard Moses M.D., pp. 44-45, 47.

25.  Dr. Alan Krumholz, the leading epileptologist in this
area, Deposition of Peter Oroszlan, M.D., p. 78-79, has
been retained by plaintiff to serve as an expert witness in
this case. Dr. Krumholz testified in his deposition that he
is of the opinion that an EEG performed in 2007 will yield
no meaningful information regarding plaintiff's 1996
medical event. Deposition of Alan Krumholz M.D., pp. 8, 28.

26.  Dr. Krumholz is of the opinion that an EEG performed
in 2007 could provide confusion about plaintiff's current
medical status, which Dr. Krumholz believes would be
detrimental to plaintiff's employment standing under these
circumstances. Deposition of Alan Krumholz M.D., p.8.

27.  Dr. Krumholz is of the opinion that an EEG performed
in 2007 could actually cause plaintiff to suffer a seizure
even if he does not have an underlying seizure disorder, as
that is an inherent risk of undergoing an EEG procedure.
Deposition of Alan Krumholz M.D., p.9-11.

28.  Dr. Krumholz testified that an EEG could disclose other medical findings that have nothing to do with the Police Department's inquiry into plaintiff's 1996 medical event, such as the presence of a tumor, infection or even degenerative disease. Deposition of Alan Krumholz M.D., p. 9.

29.  Dr. Krumholz is of the opinion that an EEG in this timeframe "is not predictive of [plaintiff] having a recurrence of his seizures in the future," and that "there's really no evidence that [an EEG] will provide any information that will predict that [plaintiff] is going to be a safer police officer, or that the public safety is going to be somehow protected by obtaining this EEG." Deposition of Alan Krumholz M.D., pp. 8, 26-28, 32-33.

30.  Dr. Krumholz is of the opinion that to perform an EEG with no clinical reason is inappropriate and a deviation from the standard of care. Deposition of Alan Krumholz M.D., p. 35.

31.  Dr. Krumholz is of the opinion that the risk of plaintiff having a seizure "in the next few years is about 1%," and that that risk will decline the longer plaintiff goes without having a seizure. Deposition of Alan Krumholz M.D., p. 19-20.

32.   Defendants' doctor, Dr. Oroszlan, is an internist, not a neurologist or epileptologist. Deposition of Peter Oroszlan M.D., p. 16. He has never published or held a teaching position, and although he testifies often at workers compensation hearings, he has never been qualified to render opinions as an expert witness in medical malpractice litigation. Deposition of Peter Oroszlan M.D., pp. 19, 24, 76-77.

33.   Dr. Oroszlan was wholly unfamiliar with the fact that an EEG can could a seizure in a patient with no underlying seizure disorder. Deposition of Peter Oroszlan M.D., p. 92-93.

34.   During his deposition, Dr. Oroszlan agreed that plaintiff *was* fit-for-duty in September 2006 when he examined him. Deposition of Peter Oroszlan M.D., p. 89-91.

35.   During his deposition, Dr. Oroszlan agreed that an EEG performed in 2007 will yield no meaningful medical information regarding plaintiff's 1996 medical event. Deposition of Peter Oroszlan M.D., p. 91.

36.   During his deposition, Dr. Oroszlan testified that he found no clinical evidence of a seizure disorder at the time that he evaluated plaintiff in September 2006. Deposition of Peter Oroszlan M.D., p. 103-104.

37.  During his deposition, Dr. Oroszlan described plaintiff's "underlying problem" at the time he examine him in September 2006 as "a history of seizure." Deposition of Peter Oroszlan M.D., p. 112.

*     *     *     *

38.  During his deposition, Chief Sheridan testified that he does not recall reading the report of Dr. Oroszlan prior to ordering plaintiff to submit to the EEG. Deposition of Chief Terrence Sheridan, pp. 75, 78-79.

39.  Chief Sheridan testified that at the time he ordered plaintiff to submit to the EEG, he knew nothing about the credentials or qualifications of Dr. Oroszlan. Deposition of Chief Terrence Sheridan, p. 73.

40.  Chief Sheridan testified that he knew nothing about what Dr. Oroszlan had or had not reviewed in connection with his evaluation of plaintiff, at the time he ordered plaintiff to submit to the EEG. Deposition of Chief Terrence Sheridan, p. 74.

41.  Chief Sheridan testified that he did not undertake any medical inquiry or research, nor did he review plaintiff's medical records, before ordering plaintiff to submit to the EEG. Deposition of Chief Terrence Sheridan, pp. 55, 68-69.

42.  Chief Sheridan testified that he did not review the transcript of plaintiff's testimony in the Crumbacker

hearing prior to ordering plaintiff to submit to the fitness-for-duty examination and the EEG. Deposition of Chief Terrence Sheridan, p. 12.

43.  Chief Sheridan testified that he did not conduct any further investigation after learning of plaintiff's testimony, rather, that he ordered plaintiff to submit to the fitness-for-duty examination "on the face of [his] testimony . . . that [he] had a seizure." Deposition of Chief Terrence Sheridan, p. 66.

44.  Chief Sheridan testified that he did not review plaintiff's personnel file or his performance evaluations prior to ordering him to submit to the fitness-for-duty examination and the EEG. Deposition of Chief Terrence Sheridan, pp. 13, 67, 107-108.

45.  Chief Sheridan testified that he did not speak with plaintiff prior to ordering him to submit to the fitness-for-duty examination and the EEG. Deposition of Chief Terrence Sheridan, p. 108.

46.  Chief Sheridan testified that he was aware that plaintiff was "an exceptional employee" at the time he ordered him to submit to the fitness-for-duty examination and the EEG. Deposition of Chief Terrence Sheridan, pp. 13, 67.

47.   Chief Sheridan testified that he knew, at the time he ordered plaintiff to submit to the fitness-for-duty examination and the EEG, that plaintiff had had the 1996 potential seizure on the job. Deposition of Chief Terrence Sheridan, p. 137.

48.   Chief Sheridan testified that he knew, at the time he ordered plaintiff to submit to the fitness-for-duty examination and the EEG, that plaintiff had done everything he was required to do under departmental policies when he was released to return to work in May 1996. Deposition of Chief Terrence Sheridan, p. 135-136.

49.   Chief Sheridan testified that he ordered plaintiff to submit to the fitness-for-duty examination and the EEG due to his concern that a seizure "might occur." He expressly testified that he had no evidence that a seizure was "likely to occur." Deposition of Chief Terrence Sheridan, p. 90.

                    *     *     *     *

50.   During the timeframe at issue, the Police Department did not have a written policy regarding fitness-for-duty evaluations. Deposition of Robert Wickless, (7/11/07 & 9/25/07), p. 101-102; Deposition of Colonel Kim Ward, (7/11/07 & 9/25/07), p. 114-115.

51.   During the timeframe at issue, the Director of the
Personnel Section for the Police Department, Robert
Wickless, issued a total of three Memoranda communicating
his concerns that the Police Department's treatment of the
four police officers with a history of potential seizures
(plaintiff, Officer Crumbacker, and the two other officers
ordered for fitness-for-duty on September 1, 2007) violated
the ADA. (The three Memoranda are hereinafter referred to
as "the Wickless ADA Memoranda.") Deposition of Robert
Wickless, p. 101-102; Deposition of Colonel Kim Ward,
(7/11/07 & 9/25/07), p. 114-115, Exh. 7 (4/28/05 memo), 11
(8/22/06 memo), and Exh. 4 (10/20/06 memo).

52.   Director Wickless wrote, in part: "Recently, because
the department has been made aware -- or in some instances,
reminded -- that certain members have a history of a
medical condition or disability, it has determined it
should take action in those circumstances. However, there
has been no empirical evidence brought forward that these
individuals are incapable of performing the essential
functions of the jobs they have been doing other than a
knowledge of a disability, a record of disability, or the
presumption of a disability noted by management in the
department. Based on this information, the department has
required a variety of actions to be taken by these

14

individuals that it does not require of other members.
This, to my mind, is clearly a violation of both the intent
and the actual statutes in the ADA." Deposition of Colonel
Kim Ward, Exh. 4.

53.  The Commander of the Human Resources Bureau, Colonel
Kim Ward, shared Director Wickless's concerns that the
Police Department's treatment of the police officers with a
history of potential seizures violated the ADA. Deposition
of Colonel Kim Ward, pp. 22, 24.

54.  Colonel Ward testified that she viewed Director
Wickless as having "good knowledge of the law" and
"exceptional" analytic abilities. She noted that he was a
very good employee with extensive training in
discrimination issues. Deposition of Colonel Kim Ward, p.
15-16.

55.  Colonel Ward has extensive "very specialized training"
in discrimination as well, and is viewed as one of the
Police Department's experts in the field. Deposition of
Colonel Kim Ward, p. 16.

56.  Colonel Ward testified that she met with Chief
Sheridan multiple times to convey their concerns that the
Police Department's treatment of the officers with a
history of potential seizures violated the ADA. Deposition
of Colonel Kim Ward, pp. 24, 68-69, 125-128.

57.   Colonel Ward testified that she delivered the Wickless
ADA Memoranda to Chief Sheridan. The documentary evidence
confirms that fact. Deposition of Colonel Kim Ward, p. 137,
Exh. 10(conveying 8/22/06 Wickless memo) and Exhs. 9&13
(re. 10/22 Wickless memo and conveying 10/22 Wickless
memo).

58.   Chief Sheridan testified, however, that he has no
recall of reading the Wickless ADA Memoranda. Deposition of
Chief Terrence Sheridan, p. 156-157.

59.   Yet, both Colonel Ward and Director Wickless testified
that Chief Sheridan called a meeting with them to address
the Wickless ADA Memoranda. In that meeting, according to
the testimony of both Colonel Ward and Director Wickless,
Chief Sheridan rebuked them and warned that if they
persisted in documenting their concerns about the legality
of the Police Department's treatment of the officers with a
history of potential seizures, they would do so "at their
peril." Deposition of Robert Wickless, pp. 72, 76-77;
Deposition of Colonel Kim Ward, p. 73-77, Exh. 6.

60.   Colonel Ward testified that at the time Chief Sheridan
ordered plaintiff to submit to the fitness-for-duty
examination, there was no medical input and no
consideration of the quality of plaintiff's performance.
Deposition of Colonel Kim Ward, p. 46.

61.  Colonel Ward testified that at the time Chief Sheridan ordered plaintiff to submit to the fitness-for-duty examination, plaintiff was known to be an exceptional performer with no attendance or health problems. Deposition of Colonel Kim Ward, p. 48-49.

62.  Colonel Ward testified that at the time Chief Sheridan ordered plaintiff to submit to the fitness-for-duty examination, the departmental forms demonstrating that plaintiff had followed procedures and had been released to return to duty back in May 1996 were in his personnel file. Deposition of Colonel Kim Ward, p. 51; Affidavit of Officer William Blake, ¶7 & Exh. A.

63.  Colonel Ward summarized her concern regarding the treatment of the four officers, as communicated to Chief Sheridan, as follows: that police officers who "are technically fully functioning, and meet the essential functions of the job, should in fact be in a situation where they are not treated differently." Deposition of Colonel Kim Ward, p. 31.

64.  Colonel Ward testified that she raised the question "many times" as to why, after plaintiff had been found fit-for-duty, he was being ordered to submit to an EEG. She testified she never got an answer. Deposition of Colonel Kim Ward, p. 63.

65.  Colonel Ward testified that the Police Department did not evaluate plaintiff's present ability to safely perform the job before ordering him to submit to the fitness-for-duty examination and the EEG. Deposition of Colonel Kim Ward, p. 91.

66.  Colonel Ward testified she did not believe there was an imminent threat of serious harm that was likely to occur if plaintiff did not submit to the EEG. Deposition of Colonel Kim Ward, p. 93.

                          *    *    *    *

67.  On August 23, 2007, the Equal Employment Opportunity Commission found that the above action by the Police Department violated the ADA. Affidavit of Officer William Blake, ¶21 and Exh. I. The EEOC reached the same Determination on the Charges of the other 3 officers as well. Based on the EEOC investigation and Determination, the U.S. Department of Justice is now considering the cases for litigation.

### BLACKWELDER STANDARD

     In this circuit, the determination of whether a preliminary injunction should be granted rests on four factors: 1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is not granted;

2) the likelihood of harm to the defendant if the preliminary injunction is granted; 3) the likelihood that plaintiff will succeed on the merits; and 4) the public interest. <u>Blackwelder Furniture Company of Statesville, Inc. v. Selig,</u> 550 F.2d 189, 195-196 (4th Cir. 1976). The four factors are not weighed equally, however. The controlling "balance-of-hardship test" provides that the relative harm to the plaintiff and to the defendant is the central focus of the analysis. "It is sufficient (to grant the motion) if the court is satisfied that there is a probable right and a probable danger, and that the right may be defeated, unless the injunction is issued, and considerable weight is given to the need of protection to the plaintiff as contrasted with the probable injury to the defendant." <u>Id</u>. at 193. In the final analysis, "where serious issues are before the court, it is a sound idea to maintain the status quo ante litem, provided that it can be done without imposing too excessive an interim burden upon the defendant." <u>Id</u>. at 194-195.

<u>THE AMERICANS WITH DISABILITIES ACT</u>

As the Supreme Court pointed out in <u>School Board of Nassau County v. Arline</u>, 480 U.S. 273, 284 (1987), "society's accumulated myths and fears are as handicapping as are the physical limitations that flow from actual

impairment." See also VanZande v. State of Wisconsin, 44 F.3d 538 (7th Cir. 1975)(" . . . many impairments are not disabling but are believed to be so, and the people having them may be denied employment or shunned as a consequence.") As the EEOC cautions, with regard to workers with epilepsy: "When it comes to safety, an employer should be careful not to act on the basis of myths, fears, generalizations, or stereotypes about epilepsy. Instead, the employer should evaluate each individual on his knowledge, skills, experience, and how epilepsy affects him." Questions and Answers About Epilepsy in the Workplace and the Americans with Disabilities Act, EEOC, http://eeoc.gov/facts/epilepsy.html.

## Disability Related Inquiries and Medical Examinations

The sole issue here is whether defendants have a right to compel medical disclosure and testing of plaintiff, an employee with a history of a potential seizure over a decade ago.

The ADA provides that once an employee is on the job, the employer can conduct disability-related inquiries and medical examinations only under very limited circumstances. Disability-related inquiries and testing can be undertaken only if they are "job-related and consistent with business necessity." Specifically, the ADA provides that an employer

"shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature and severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. 12112(d)(4)(A)(1994); 29 C.F.R. 1630.14(c)(1998).

As the language of the statute makes clear, that prohibition applies to all employees, not just those with disabilities. EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act, General Principles, (7/26/00), Section B, nn. 13-15, http://eeoc.gov/policy/docs/guidance-inquiries.html.; EEOC Compliance Manual, §2-II(B)(8)(5/20/98); see also, Conroy v. New York State Dept. of Correctional Services, 333 F.3d 88, 94-95 (2nd Cir. 2003); Cossette v. Minnesota Power & Light, 188 F.3d 964,969-970 (8th Cir. 1999)(and cases cited therein); Karraker v. Rent-a-Center, Inc., 239 F.Supp.2d 828, 834-836 (C.D.Ill. 2003), Jackson v. Lake County, 2003 WL 22127743, *7-9 (N.D.Ill. 9/15/03).  The EEOC interpretive guidelines, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and

litigants may properly resort for guidance." <u>Meritor Sav.</u>
<u>Bank, FSB v. Vinson,</u> 477 U.S. 57, 65, 91 L. Ed. 2d 49, 106
S. Ct. 2399 (1986) (citations and internal quotation marks
omitted).

The purpose of the prohibition is to prevent employers
from conducting medical evaluations that serve no
legitimate purpose. As Congress noted, that is necessary
because "an inquiry or medical examination that is not job-
related serves no legitimate purpose, but simply serves to
stigmatize a person with a disability." See S.Rep.No. 101-
116 at 39-40 (1989); H.R.Rep.No. 101-485, pt.2, at 75
(1990).

Disability-related inquiries and testing are "job-
related and consistent with business necessity" if the
employer "has a reasonable belief, based on objective
evidence, that: (1) an employee's ability to perform
essential job functions will be impaired by a medical
condition; or (2) an employee will pose a direct threat due
to a medical condition." EEOC Enforcement Guidance, Job-
Related and Consistent with Business Necessity, <u>supra</u>,
Section A. The EEOC makes clear, however, that "an
employer's reasonable belief that an employee's ability to
perform essential job functions will be impaired by a
medical condition or that s/he will pose a direct threat

due to a medical condition must be based on *objective evidence* obtained, or reasonably available to the employer." Id. (emphasis original); see also Conroy v. New York State Dept. of Correctional Services, supra, 333 F.3d at 98. Significantly, the EEOC states: "such a belief requires an assessment of the employee and his/her position and cannot be based on general assumptions." Id. As Congress set out in the legislative history of the ADA: "actual performance on the job is, of course, the best measure of ability to do the job." See S.Rep.No. 101-116 at 39 (1989); H.R.Rep.No. 101-485, pt.2, at 75 (1990).

To meet the "direct threat" standard, an employer must show "a significant risk of substantial harm that cannot be eliminated or reduced by reasonable accommodations." 29 C.F.R. §1630.(r)(1998). It is the employer's burden to prove that a reasonable person could believe that the employee poses a direct threat. Conroy v. New York State Dept. of Correctional Services, supra, 333 F.3d at 98-99; Tice v. Centre Area Transportation Authority, 247 F.3d 506, 516-519 (3rd Cir. 2001).

As it applies to epilepsy, the direct threat assessment must be based on "objective, factual evidence, including the best recent medical evidence and advances to treat and control epilepsy." EEOC Questions and Answers About

Epilepsy in the Workplace and the Americans with
Disabilities Act, http://eeoc.gov/facts/epilepsy.html. "In
making a 'direct threat' assessment, the employer must
evaluate the employee's present ability to safely perform
the job. The employer also should consider: (1) the
duration of the risk; (2) the nature and severity of the
potential harm; (3) the likelihood that the potential harm
will occur; and (4) the imminence of the potential harm.
The harm must be serious and likely to occur, not remote
and speculative." 29 C.F.R. §1630.(r)(1998).

Retaliation

The ADA prohibits retaliation against those who engage
in protected activity, including those who participate in
any manner in proceedings related to the ADA. That
provision also extends protection to those who advocate on
behalf of another they believe has been subjected to a
violation of his or her rights under the ADA, and to those
who oppose any practice they believe is illegal under the
ADA. 42 U.S.C. §12203(a); see also EEOC Compliance Manual,
§8-II(A)(5/20/98) http://eeoc.gov/policy/docs/retal.html.
As with the protections against illegitimate medical
inquiries or testing, those protections extend to all
employees, not just those determined to be disabled. See

EEOC Compliance Manual, _supra_, §§2-II(A)(5) and 8-I(B), at n.7.

ARGUMENT

### The EEG and any future medical inquiry or testing is not job-related and consistent with business necessity.

As a preliminary matter, plaintiff asserts that because defendants have failed to plead the affirmative defense of business necessity, they have waived the right to assert it. On this basis alone, the Court can enter judgment for plaintiff. F.R.Civ.P. 8(c).

Even if defendants were not precluded from raising the affirmative defense, the evidence is clear that defendants cannot meet either exception to the prohibition on compelled medical disclosure or testing. Significantly, the evidence is irrefutable that defendant did not even consider any of the essential factors prior to ordering the fitness-for-duty examination and EEG. Instead, they did precisely what is forbidden: they proceeded based on "myths, fears, generalizations, [and] stereotypes about epilepsy." EEOC Questions and Answers About Epilepsy in the Workplace and the Americans with Disabilities Act, _supra_.

Focusing on the first prong -- "an employer's reasonable belief that an employee's ability to perform essential job functions will be impaired by a medical

condition. . . based on *objective evidence* obtained, or
reasonably available to the employer," EEOC Enforcement
Guidance, Job-Related and Consistent with Business
Necessity, Section A, <u>supra</u> -- there is no evidence at all
that defendants gathered or considered the "objective
evidence" pertaining to that matter. They failed wholly to
undertake the requisite "assessment of [plaintiff] and his
position," thereby ignoring what Congress defined as "the
best measure of ability to do the job." See S.Rep.No. 101-
116 at 39 (1989); H.R.Rep.No. 101-485, pt.2, at 75 (1990).

Had they considered the objective evidence regarding
those factors, they would have discerned that there was
absolutely no objective evidence that plaintiff's "ability
to perform essential job functions will be impaired by a
medical condition." Indeed, all the objective evidence is
to the contrary. As has been demonstrated beyond dispute
over the course of a decade, plaintiff can perform his
essential job functions without interference from a medical
condition; in fact, he can and does perform his job duties
in a manner that places him in the top tier of the police
force.

The medical evidence is no less compelling -- the fact
is, there is no evidence plaintiff even has a present
"medical condition" at all. Defendants' own doctor found

26

plaintiff fit-for-duty, with "no clinical signs of a seizure disorder". Deposition of Peter Oroszlan M.D., pp. 103-104. All he "found" was a "history of" a potential seizure. Deposition of Peter Oroszlan M.D., p. 112. That "finding" did not even require a medical degree, given that all involved agreed that was so. Moreover, taking adverse action based on "history of" a medical condition raises more serious problems under the ADA, although that is an issue for another stage of the proceedings.

Plaintiff's treating neurologist and the expert epileptologist also make clear that it is unknown whether plaintiff actually suffered a seizure in 1996 at all, and that in any event, there is close to zero chance that plaintiff will ever experience a seizure hereafter.

Defendants fare no better in meeting the second prong, known as the "direct threat" standard. They cannot possibly show "a significant risk of substantial harm that cannot be eliminated or reduced by reasonable accommodations," based on "objective, factual evidence, including the best recent medical evidence and advances to treat and control epilepsy." 29 C.F.R. §1630.(r)(1998); EEOC Questions and Answers About Epilepsy in the Workplace and the Americans with Disabilities Act, supra. Again, they skipped over Congress's "best evidence": the reality of plaintiff's

present ability to safely perform his job. Then they
completely bypassed the required assessment of (1) the
duration of the risk of plaintiff suffering a seizure on
the job; (2) the nature and severity of the potential harm
of plaintiff experiencing a seizure on the job; (3) the
likelihood that plaintiff will suffer a seizure on the job;
and (4) the imminence of plaintiff suffering a seizure on
the job. See 29 C.F.R. §1630.(r). Likewise, they ignored
the requirement that "the harm must be serious and likely
to occur, not remote and speculative." Id. Again, had they
undertaken the required analysis, they would have concluded
that not one requirement was satisfied, and they had no
right to subject plaintiff to such invasive and humiliating
treatment.

In sum, while proclaiming that they were acting for
safety reasons, in reality defendants reacted without
analysis or rational basis, resorting to "myths, fears,
generalizations, [and] stereotypes about epilepsy."
Had they undertaken the requisite analysis, they could only
have reached one conclusion based on the objective
evidence: no fitness-for-duty, no medical disclosure, no
EEG. Plaintiff was an exceptional performer for over a
decade; defendants' own hired doctor found plaintiff fit
for duty; and there was not a scintilla of evidence of a

"serious likelihood" or "significant risk" that a seizure that would cause "substantial harm" was imminent.

Even if they could ever clear that high bar, the opinions of the neurologist and epileptologist are that an EEG will yield no meaningful information, and that it "is not predictive" of plaintiff having a seizure nor helpful in protecting public safety. Defendants did not meet or rebut those expert opinions. The law is clear that even where a medical examination is permissible under the ADA, the scope of the examination itself must be "job-related and consistent with business necessity." Where the employer is within the zone of permissible disability-related inquiry, it still must "obtain only the information needed to make an assessment of the employee's present ability to perform her job and to do so safely." EEOC Questions and Answers About Epilepsy in the Workplace and the Americans with Disabilities Act, supra; see also Sullivan v. River Valley School District, 197 F.3d 804,811-812 (6th Cir. 1999), cert. denied, 530 U.S. 1262 (2000); Riechmann v. Cutler-Hammer, Inc., 95 F.Supp.2d 1171,1185-1187 (D.Kan. 2000)(though exam was consistent with business necessity, scope of exam was overly broad and not job-related); Belk v. Southwestern Bell Telephone Co., 194 F.3d 946, 951 (8th Cir. 1999)("an employer urging a business necessity defense

must validate the test or exam in question for job-relatedness to the specific skills and physical requirements of the sought-after position".).

Dr. Oroszlan, meanwhile, did not even know that an EEG can cause a seizure in a person with no underlying seizure disorder. Deposition of Peter Oroszlan M.D., pp. 92-93. Nor could he justify the request for the EEG as other than a medical fishing expedition in a patient with no clinical signs justifying it. Deposition of Peter Oroszlan M.D., pp. 91, 103-104, 112.

The law is well-settled that an employer cannot hide behind the inadequate or erroneous medical review of their hired doctor. Rather, their legal obligations under the ADA endure and are not avoided by mistaken, unreasonable or blind reliance on their doctor's opinions. See Bragdon v. Abbott, 524 U.S. 627 (1998)("It did not suggest that an individual physician's state of mind could excuse discrimination without regard to the objective reasonableness of his action . . . the question presented [is], whether petitioner's actions were reasonable in light of the available medical evidence."); Rodriquez v. ConAgra Grocery Products, 436 F.3d 468, 484 (5th Cir. 2006)("ConAgra cannot escape its obligation to evaluate Rogriquez's actual abilities, notwithstanding his diabetes, by blindly relying

on the assessment of Dr. Morris."); Echazabel v. Chevron
UAS, Inc., 336 F.3d 1023, 1028 (9th Cir. 2003)("A subjective
belief in the existence of a risk, even one made in good
faith, will not shield the decisionmaker from liability.
This Circuit has held that an employer must gather
'substantial information' about an employee's work history
and medical status."); Lowe v. Alabama Power Company, 244
F.3d 1305, 1308-1309 (11th Cir. 2001)("To prevent the very
reliance on stereotype and related perceptions of an
individual's limitations that the ADA prohibits, an
employer must point to particularized facts about the
specific person's condition to support its decision. . .
The restrictions were also based, at least in part, on
[Dr.] Carmichael's assumption that all double amputees have
the same limitations. . . . Alabama Power's decision that
Lowe was unable to perform the mechanic position safely was
not based, therefore, on particularized facts using the
best available objective evidence as required by
regulations."); Holiday v. City of Chattanooga, 206 F.3d
637, 645 (6th Cir. 2000)("Employers do not escape their
legal obligations under the ADA by contracting out certain
hiring and personnel functions to third parties. . . . In
short, Dr. Dowlen's recommendation, in addition to being
unsupported by any concrete medical findings, is also at

31

odds with the objective evidence on record."); <u>Taylor v.
Pathmark Stores, Inc</u>. 177 F.3d 180, 192 (3rd. Cir. 1999)("a
company may not escape liability in a situation where a
plaintiff can demonstrate that the company's reliance on
its doctor's medical determination was unreasonable or in
bad faith."); <u>Riemer v. Illinois Dept. of Transportation</u>,
148 F.3d 800(7th Cir. 1998); <u>EEOC v. Browning-Ferris, Inc.</u>,
262 F.Supp.2d 577, 590-591 (D.Md. 2002)("A jury could
conclude that BFI's assessment of Ms. Brown, based entirely
on the opinion of a physician with minimal experience
treating Crohn's Disease patients who spent fifteen minutes
examining Ms. Brown, was based on neither the most current
medical knowledge or the best available objective
evidence."); <u>Ragan v. Jeffboat</u>, 149 F.Supp.2d 1053, 1070
(S.D.Ind. 2001)("In the context of the ADA, the employer
bears the risk of mistakenly treating an employee as
disabled if it turns out the employee isn't."); <u>EEOC v.
Texas Bus Lines,</u> 923 F.Supp. 965 (S.D.Tex.1996)("it was
improper for [defendant] to rely on the erroneous and
subjective opinion of [their doctor] regarding
[plaintiff]'s physical qualification for the driver
position.").

Defendants should not be permitted to, in essence,
cover their eyes and ears and abandon common sense, while

claiming the right to act urgently to protect the public. The controlling law is well-established. In fact, it is prominently posted by the EEOC on its web-site in accessible terms for employers. The central factors in the analysis -- the employee's performance and the medical facts -- are neither surprising nor mysterious. Yet, defendants chose to ignore the facts concerning plaintiff's consistently exceptional job performance and the reliable medical information, and substitute fear mongering.

Chief Sheridan testified he did not even read Dr. Oroszlan's report. He did not read plaintiff's testimony. He did not read the medical records concerning plaintiff's 1996 event, nor did he read any medical information about seizures. He did not review plaintiff's personnel file or speak to plaintiff or his supervisors. When Dr. Oroszlan recommended an EEG *after* finding plaintiff fit-for-duty, he did not look into Dr. Oroszlan's credentials or qualifications nor did he look into what Dr. Oroszlan reviewed in making that recommendation. He admitted without hesitation that he acted based "on the face of [plaintiff's] testimony . . . that [he] had a seizure," Deposition of Chief Terrence Sheridan, p. 66, and nothing more. He admitted he ordered the examination and testing because a seizure "might occur," and that he had no

evidence it was "likely" to occur. Deposition of Chief
Terrence Sheridan, p. 90. By his own admission, then, Chief
Sheridan did not even attempt to comply with the ADA.

To compound the matter, Chief Sheridan stubbornly
stuck with that approach while his two senior human
resources professionals, one a Colonel and the other the
Director of Personnel, repeatedly warned him that his acts
appeared to violate the ADA. Director Wickless could not
have made it more clear: "Based on this information, the
department has required a variety of actions to be taken by
these individuals that it does not require of other
members. This, to my mind, is clearly a violation of both
the intent and the actual statutes in the ADA." Deposition
of Colonel Kim Ward, Exh. 4. As Director Wickless and
Colonel Ward knew, the law inarguably required much more of
Chief Sheridan and the Police Department before plaintiff
was subjected to such invasive and offensive action.

### Plaintiff is entitled to a preliminary injunction, as a matter of law.

Turning to the Blackwelder test, the balance of
hardship analysis weighs heavily in plaintiff's favor.
Examining "the likelihood of irreparable harm to the
plaintiff if the preliminary injunction is not granted,"
the two physicians with qualifications in the sub-specialty

34

at issue, Drs. Moses and Krumholz, testified the EEG will
yield confusion rather than meaningful information, while
exposing plaintiff to the risk that the EEG could induce a
seizure. As well, as Dr. Krumholz testified, the EEG could
reveal other medical changes in plaintiff's brain that are
unknown to plaintiff and, quite frankly, none of the Police
Department's business.

In contrast, "the likelihood of harm to the defendant
if the preliminary injunction is granted" is minimal to
nil. Again, the two qualified experts testified the chance
of plaintiff ever having another seizure is extremely
remote, in the range of 1-5% over his lifetime. Moreover,
the "true facts" demonstrate that plaintiff has been
working for 11 years without incident, including the year
that has passed since the Chief of Police issued the order.
Balancing those two factors alone, we submit, entitles
plaintiff to the preliminary injunction.

Moving on to a consideration of the last two
Blackwelder factors only serves to strengthen plaintiff's
argument. As demonstrated by the review of the facts and
law above, coupled with the EEOC's finding that the acts
were illegal, the likelihood that plaintiff will succeed on
the merits is high. Added to that, we have the admission of

the Police Department itself that the acts are illegal, as succinctly set out in the Wickless ADA Memoranda.

Lastly, the public interest is served by holding a government entity to the strict prohibitions of federal anti-discrimination law, thereby ensuring that police officers who serve with distinction are recognized and rewarded, not harassed, grilled and probed. Just because defendants shout "public safety" does not mean they are acting in the public interest. Here, all the evidence is to the contrary. Given the undisputed facts, the public interest is served by stopping this compelled study of plaintiff's brain. To permit such an invasion of plaintiff's bodily integrity, which may later be determined to be illegal, is uniquely irreparable. That brain study surely is a bell that could never be "unrung," nor for which plaintiff could later be adequately compensated in money damages.

CONCLUSION

There was no evidence at all from which defendants could have concluded or even reasonably questioned whether plaintiff could perform his essential job functions, in 2006 or at present. Instead, they chose to ignore the quality of plaintiff's job performance -- "the best measure of ability to do the job" -- which was inarguably

exceptional over the decade since his 1996 medical
incident. Likewise, there was no evidence at all that
plaintiff posed a risk of potential harm to himself or
others. Surely defendants have not met and cannot clear the
far higher bar of "a significant risk of substantial harm"
which is imminent and likely to occur.

Given the wholesale failure to consider the facts and
controlling law, even in the face of the prescient,
insistent warnings of in-house professionals, defendants'
chosen course was either recklessly illegal, or calculated
to retaliate and silence, or both. Either way, plaintiff
now is entitled to judgment on his request for preliminary
injunction barring the EEG or any other medical inquiry or
testing as a matter of law.

/S/

_____
Kathleen  Cahill
The Law Offices of
     Kathleen Cahill LLC
15 East Chesapeake Avenue
Towson, MD  21286
410-321-6171
Bar No. 02006

Attorney for Plaintiff